*5 OPINION OF THE COURT
Joseph F. Farlo, J.
During a period of several sessions, the court conducted a Wade hearing concerning a trilogy of indictments, intertwined by a common thread consisting of “the photo spread” utilized in all three. Although the hearings were consolidated, the court will separate each decision in order to . identify the particular indictments involved.
INDICTMENT NO. 1581/82
The People called Carmen Oquendo, and the defendant called Police Officers Richard Carbone and Patrick Laffey.
On the afternoon of January 19, 1982, Oquendo, while working at a laundromat several blocks from her home, observed the defendant and three others “hanging out in front of the laundromat”. She knew them from the neighborhood, and two of them as Skip and T. Later that evening, on her way shopping, she observed the defendant and two others behind the stairway of a subway station located in the vicinity of Jamaica Avenue and 121st Street. When seen previously in front of the laundromat, the defendant was wearing blue jeans and a dark bluejacket with a hood; when she observed him behind the subway, he was wearing the same clothes.
A short time later that evening while at home, which is approximately a block from the subway, her attention was called to the window by her daughter and upon looking out the window, she observed the defendant and others attacking Mr. Charles Remichi. The defendant was kneeling on top of Remichi while another person was removing Remichi’s watch. Oquendo banged on the window, then ran out as defendant looked up at her and then all fled. During all these observations, the defendant was only a few feet away and the lighting conditions were good.
When the police arrived in response to the Remichi robbery, she described the defendant as a male black with very short hair, wearing blue jeans and a dark blue jacket. She also informed the pólice officer of the street names for two of the other three perpetrators as Skip and T.
*6 Officer Carbone’s involvement in this case appears to be peripheral in the respect that on February 15, he spoke to Oquendo at the laundromat and she, at that time, informed him that two of the perpetrators were known as Skip and T. At 2:30 that afternoon, she called him at the precinct to inform him that some of the perpetrators were outside the laundromat. He responded, brought them back to the laundromat, and upon her identifying these individuals, he arrested them. The defendant was not one of them.
On March 15, Officer Laffey, the investigating detective, showed Oquendo “the photo spread” which he had prepared. Upon viewing “the photo spread”, Oquendo identified photo No. 3 and placed her initials on the reverse side of the defendant’s picture.
The court finds “the photo spread” contained a fair representation, and the police conduct, while showing it to Oquendo, proper.
Additionally, the court finds an independent source for her identification. Repeatedly, Oquendo insisted she knew defendant from the neighborhood. Although she did not know his name, she knew his face. In many cases, the face of the perpetrator is known to the victim as that of a neighborhood hang-around. This is a common factor in establishing independent source. (See People v Brown, 34 NY2d 879; People v Oakley, 28 NY2d 309; People v Grier, 45 AD2d 688, mod 37 NY2d 847.) Furthermore, Oquendo viewed the defendant on several occasions during the day of the robbery and clearly viewed his face.
Defense counsel argues that Oquendo’s children, who possibly witnessed the robbery, should have been called to testify or be prohibited from attempting to identify defendant at the trial. The purpose of a Wade hearing is to determine whether defendant’s constitutional rights have been violated by a pretrial police-induced identification procedure. The People have represented to the court that Oquendo’s children were not subjected to such a procedure. If this be the case, then the children may be called at trial and the District Attorney can attempt to have them identify defendant (People v Bullock, 45 AD2d 902).
*7 INDICTMENT NO. 2084/82
At the hearing, the People called Joseph Pristina and Detective Anthony E. Burke, Jr. Based upon their testimony, the court finds that on April 27, 1982, Pristina was babysitting for some friends on the second floor of a two-family house and had been at the premises since 2:00 p.m. At approximately 3:30 p.m., Isaac, previously known to Pristina, called him into the kitchen and introduced him to three of the individuals in the kitchen as Big Min, Big Nick (later identified as defendant, Carter), and Eddie. After a few minutes of conversation, Pristina returned to the living room to watch TV. A short time thereafter, Isaac informed Pristina that some people were throwing bottles off the bridge; Pristina then ran down the flight of stairs to exit the premises. Upon reaching the bottom of the stairs, he observed Big Nick and Big Min at the bottom of the stairs. As he approached, Big Min put a knife to his throat, the perpetrators removed a gold chain from his neck, relieved him of some money, and ran out. The theft occurred in a well-lit area.
On April 29, Pristina reported the incident to the police, and on May 4, he spoke to Detective Burke at the 102nd Precinct who showed him “the photo spread”. He identified photo No. 3 as that of defendant, Carter.
On May 27, Pristina viewed a lineup at the 112th Precinct and identified defendant, Carter. The lineup was conducted the same date; the lineup was conducted on Indictment No. 1534/82, although different detectives were responsible for each. Further, the defendant was represented by the same attorney on both indictments.
As previously indicated, the court finds “the photo spread”, and in this indictment, the police procedure, to be nonsuggestive.
Regarding the lineup, counsel argues that the take-out order prepared to obtain custody of the defendant to bring him to the 112th Precinct for the lineup was prepared for the case of the gas station robbery (Indictment No. 1534/82, infra), and not Pristina’s robbery. Counsel argues this procedure was improper although he has not explained how this procedure has prejudiced defendant. Counsel *8 failed to provide, and the court has been unable to discover any New York cases quite on point. Accordingly, it appears to be a matter of first impression.
The law is settled that the Fifth Amendment privilege against self incrimination is not violated by compelled participation in identification procedures (United States v Wade, 388 US 218). Once a person is lawfully incarcerated, he may be forced to appear in lineups for any number of crimes (Adams v United States, 399 F2d 574). It has been held by New York courts that there is no violation of due process, ordering a defendant to appear in a lineup once he is in custody (Matter of Pidgeon v Rubin, 80 AD2d 568; People v McClain, 88 Misc 2d 693). The fact that counsel was not warned ahead of time that a witness to another robbery would be present does not change the fact that even if counsel had known this fact, he could not have legally prevented the lineup. The role of counsel at a lineup is usually that of an observer. The fact that different witnesses other than those counsel expected viewed the lineup, in no way violated defendant’s rights nor changes counsel’s role. It would be a waste of time and taxpayers’ money to require the District Attorney to prepare a separate take-out order and hold a separate lineup for each crime a defendant is charged with or suspected of committing. This court will not require that of the District Attorney.
Finally, the court finds an independent source for Pristina’s in-court identification. Taking into account the factors previously mentioned, Pristina had ample opportunity to observe defendant. He was introduced to him and stayed with him in the same room for approximately a minute. He observed the defendant again during the crime. He made the identification approximately seven days after the incident and was sure of it. Under these circumstances, the court finds an independent basis for Pristina’s identification.
INDICTMENT NO. 1534/82
The People called Gasper Ashley, Linton Pommells and Detective De Marco.
*9 On April 27, 1982, at approximately 6:30 p.m., Pommells, the owner of the service station located at 101st Avenue, Richmond Hill in Queens County, was seated on the edge of a desk in the office speaking with Ashley and Sonya Kasko. The office was separated by a half-door partition from the storage area.
As the parties were engaged in conversation, a male black (later identified as the defendant, Carter), entered carrying an orange-colored box from which he produced a gun and announced a stickup. He then passed between Ashley and Pommells and attempted to enter the store room. As he was doing so, Pommells stood up. As he stood up, a second male black, later identified as Johnny Rucker, entered the office and without saying a word, shot Pommells. Before leaving, they relieved Kasko of her jewelry and took some other articles from both Ashley and Pommells. The incident took approximately 10 to 15 minutes in a well-lit area.
Ashley called the police and when they arrived, he described the two perpetrators to them and Pommells was taken to the hospital.
On April 29, “the photo spread” was shown to Ashley by Detective De Marco who identified picture No. 3 as that of Carter.
On May 2, Detective De Marco visited Pommells in the hospital, who was under sedation at the time. Nevertheless, he picked out Carter but could not identify Rucker, whose picture was contained in another photo spread. On May 8, Detective De Marco was informed that Pommells was in critical condition and at 5:20 that evening, he visited Pommells, who this time again picked out photo No. 3 and made certain markings on the picture but was too weak to initial or sign his name.
On May 27, a lineup was arranged at the 112th Precinct and both Kasko and Ashley were advised to attend. Kasko made the first viewing and was not able to identify anyone. Ashley was then called and he also was not able to identify anyone except that when he returned to the outside waiting area, he had a conversation with Detective De Marco and informed him that there was someone in the lineup *10 that was familiar, but he was not the person who shot Pommells, who he expected to identify. When informed of this and following a conversation with the attorney representing Carter (Mr. De Felice) over counsel’s objection, a second lineup was conducted in which Carter’s position, number and clothing were changed, and when Ashley was asked to again view the lineup, he identified the defendant, Carter, as the first male black who entered the service station office on April 27, 1982.
In court, during Pommells’ testimony, the defendant voluntarily excused himself from the courtroom. Pommells was unable to identify the photo he had picked out twice at the hospital. Accordingly, defense counsel argues that Pommells’ photo identification must be suppressed due to his failure to identify the photos in court. The court disagrees. The purpose of a Wade hearing is to determine whether the identification testimony which the People plan to introduce is based upon an illegal confrontation or whether it is based upon a proper and independent source (People v Huggler, 50 AD2d 471, 474). While the People have the burden of going forward, the defendant has the burden of proving a violation of due process. (See People v Rahming, 26 NY2d 411; People v Ballott, 20 NY2d 600.) The fact that Pommells was unable to identify the photos he previously identified does not demonstrate a violation of due process. As previously stated, the court has examined “the photo spread” and finds that the spread, in and of itself, is not so unduly suggestive so as to single out the defendant’s photo. The photos show six male blacks of approximately the same age, either just face or from the chest up. There is nothing distinctive in defendant’s photo which would unfairly single him out.
The method of showing the spread to Pommells likewise was not violative of defendant’s rights. Although Pommells was shown the same photo spread twice, there is no suggestion that Pommells was unduly influenced by this procedure or that he picked defendant’s photo based on anything other than his own recollection. The fact that he was shown the same display twice does not make the procedure suggestive. (See United States v Peterson, 524 F2d 167, cert *11 den sub nom. Smith v United States, 424 US 925; see, also, People v Van Buren, 87 AD2d 900.)
The fact that Pommells was unable to identify the photos in court and certain discrepancies existed between his recollection of the photo display procedure and Detective De Marco’s recollection of the procedure does not affect this court’s decision with respect to independent source.
Pommells testified he was brought a book and had to flip through pages to look at the photos. Detective De Marco showed him three photo spreads containing six photos each, or 18 pictures which can be interpreted as a book by a person under heavy sedation. In any event, this discrepancy is not of such importance as to influence this court’s decision. Further, it is not uncommon for a witness to find difficulty in identifying a defendant at trial months after the event. This problem in the prosecution of cases was alleviated when the Legislature passed CPL 60.25 which allows for identification by means of previous recognition in the absence of present identification. While this section applies to corporal identification only, and not to photographic identification, the rationale behind it is the same as to each, namely that a victim, although presently unable to identify a defendant, is nevertheless certain now that the man he previously identified is the man he saw on the incriminating occasion. This inability to currently identify the defendant does not necessarily imply that the witness does not have an independent basis for his identification (People v Gonzalez, 61 AD2d 666, affd 46 NY2d 1011; People v Van Buren, supra). The factors to be considered by the court in determining whether an independent source exists are the prior opportunity to observe the alleged criminal act, discrepancies, if any, of description given by the witness, identification of another person, failure to identify the defendant on a prior occasion and the lapse of time between the alleged act and the identification procedure (United States v Wade, supra). In the later cases of Neil v Biggers (409 US 188) and Manson v Brathwaite (432 US 98), additional factors were listed by the Supreme Court which would allow an otherwise suggestive identification procedure to be admitted because the identification is reliable. These additional factors are the witness’ degree *12 of attention during the crime and the level of certainty at the confrontation. Taking these factors into consideration, the court cannot find that under a totality of the circumstances, there is “a very substantial likelihood of irreparable misidentification” (Simmons v United States, 390 US 377, 384). Pommells described the defendant as being 5 feet, 7 inches to 5 feet, 9 inches, black, 19 to 22 years of age, and light skinned. He observed his face during the robbery which lasted approximately 15 minutes. He was face to face with defendant as he was going through his pockets. Pommells was able to remember in detail the manner in which the crime occurred and finally, Pommells was shown the photos the first time on May 2 only six days after the robbery. Although sedated, he picked the same photo twice. Considering all the above factors, the court finds an independent source for Pommells’ identification and, therefore, will permit the People to attempt to have him identify defendant at trial.
Regarding Ashley’s identification, the court has already commented upon the fairness of “the photo spread” and, therefore, finds the photo identification not to be impermissibly suggestive.
The lineup was also nonsuggestive. The court examined the lineup photographs and finds that the fillers with defendant were not so dissimilar in appearance to him as to be suggestive. (See People v Burwell, 26 NY2d 331 ; People v Lebron, 46 AD2d 776.)
The fact that two lineups were held involving the same eyewitness is not defective. The police conduct was not improper. Ashley’s explanation that he was looking for the person who shot Pommells, rather than the other perpetrator, is credible and understandable.
Counsel’s objection to the second lineup does not warrant a different conclusion. While a defendant has a constitutional right to assistance of counsel at corporal identification after the initiation of formal proceedings (Kirby v Illinois, 406 US 682), counsel’s role is limited to that of an observer. He is not allowed to actively advise his client during the lineup (People v Hawkins, 55 NY2d 474, 485). Although counsel objected, it should be noted that during *13 the second lineup, the defendant’s position, clothing and number were all changed, further insuring against the possibility of suggestiveness.
Using the guidelines described above, in addition to the lack of suggestion in the identification procedures, the court finds an independent basis for Ashley’s in-court identification. He was able to describe the incident in great detail. He had the defendant under observation for 15 to 20 minutes and he was certain of his identification when he observed the photos, at the lineup and in court at the Wade hearing. Therefore, the court finds that none of the identification procedures was improperly suggestive and, additionally, finds an independent source for his in-court identification.
Kasko did not testify at the hearing. Accordingly, the court will not permit the District Attorney to have her attempt to identify the defendant in court at trial. Fragments of testimony from various witnesses indicated that Kasko identified defendant from a photo spread, but was unable to identify him at the lineup. While the People correctly cite the case of People v Sutton (47 AD2d 455), for the proposition that it is not necessary for the People to produce the eyewitness at a pretrial hearing, there is a condition, that is, the People must meet their initial burden of going forward with evidence by showing the reasonableness of the police conduct in the first instance (People v Sutton, supra). The People have failed to do this. There was no testimony regarding Kasko’s identification of defendant’s photo, either what was said or shown to her. Upon this record, the court cannot make a decision as to the reasonableness of the police conduct and, therefore, defense counsel’s motion to suppress Kasko’s identification both in court and out of court is granted.