THIRD DEPARTMENT, NOVEMBER, 2011

(November 3, 2011)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HASHIM BURNELL, Appellant. [931 NYS2d 776]—

Egan Jr., J.

Defendant was indicted and charged with murder in the first degree, two counts of murder in the second degree and three counts of robbery in the first degree. The charges stemmed from an incident that occurred on May 5, 2005, during the course of which defendant, then two weeks shy of his 20th birthday and while on parole from a prior felony conviction, allegedly robbed and fatally wounded Todd Pianowski (hereinafter the victim) and robbed the victim's girlfriend, Lauren Parker, at gunpoint in the apartment the victim and Parker shared in the Town of Guilderland, Albany County. Although the People's first attempt to prosecute defendant ended in a mistrial, a second trial ensued and, at the conclusion thereof, a jury convicted defendant of murder in the first degree and three counts of robbery in the first degree. Defendant thereafter was sentenced as a second felony offender to, among other things, life imprisonment without the possibility of parole upon his conviction for murder in the first degree. This appeal by defendant ensued.

Defendant initially contends that the verdicts are not sup-

ported by legally sufficient evidence and, further, are against the weight of the evidence—arguing primarily that there is insufficient evidence to identify him as the perpetrator. We disagree.

Parker testified that upon arriving at her apartment shortly after 2:00 P.M. on the afternoon in question, she encountered a man, whom she unequivocally identified at trial as defendant, standing in the kitchen and fiddling with a yellow plastic bag from a local grocery store. Almost immediately, defendant put a handgun to her head and demanded that she give him everything in the apartment—a reference she understood to mean any cash or drugs that might be present. Parker noticed the victim lying face down on the living room floor and, as she bent down to retrieve the demanded items from underneath a futon, observed blood on the victim's body. Defendant pointed to the victim and stated, "[D]o you see him[?] [D]o you see what he got for owing me [$1,500?]" Defendant then picked up the yellow grocery store bag, escorted Parker from the apartment and, while waiting for the elevator, went through her purse and removed her cash and identification. Parker estimated that she observed defendant—face to face and in good lighting—for approximately 5 to 10 minutes and thereafter provided a detailed physical description of her assailant to the police. Parker's description matched defendant's general characteristics, as well as the clothing he was photographed wearing when he was arrested approximately eight hours later—including the large, square diamond earrings previously described by Parker.

In addition to the foregoing, police subsequently recovered a backpack that defendant left with a friend on the day of the crimes, which contained, among other things, a yellow plastic grocery bag, a box of .40 caliber ammunition, a woman's purse and a small travel bag. Parker testified that she last saw the purse, which belonged to her, and the black travel bag, which belonged to the victim, under the futon when she left the apartment on the morning in question. Additionally, a firearms examiner testified that the .40 caliber bullets recovered at the scene were the same style of bullet, i.e., the same flat-nose bullet with the same jacketing material, as those contained in the box of ammunition and, further, that the expended shell casings recovered at the scene bore the same manufacturer's stamp as those present in the box of ammunition found in the backpack linked to defendant.[1] Moreover, defendant's fingerprints were discovered on a coffee table in the victim's apartment, the

---

1. Although the gun itself was not recovered, a prosecution witness testified that defendant contacted him approximately two to three weeks before

*(n. cont'd)*

victim's fingerprints were found on a small plastic bag inside the backpack and security cameras at the victim's apartment complex showed an individual matching defendant's description exiting the premises with a plastic bag around the time of the murder. There also was ample testimony detailing defendant's financial difficulties in the weeks preceding the crimes, as well as his sudden influx of money immediately following the crimes. Finally, defendant expressed an acute awareness of the crimes, as evidenced by his postarrest statements wherein he inquired as to Parker's welfare and, with regard to the victim's family, stated, "They probably want to kill me."

Viewing this evidence in the light most favorable to the People and according them the benefit of every inference that reasonably may be drawn therefrom (see People v Lowin, 71 AD3d 1194, 1196 [2010]), we find legally sufficient evidence to satisfy each and every element of the underlying crimes (see Penal Law § 125.27 [1] [a] [vii]; § 160.15 [1], [2]). Further, despite whatever minor inaccuracies may have existed in Parker's description of her assailant[2] and notwithstanding defendant's protestations of innocence, the plausible explanation offered for finding his fingerprints at the scene and the other proof submitted upon his behalf, the record nonetheless contains overwhelming evidence of defendant's guilt. Accordingly, the verdicts are not against the weight of the evidence.

Defendant next contends that County Court abused its discretion in admitting testimony regarding defendant's history of drug sales, his recent financial difficulties and his possession of, and attempts to sell, a .40 caliber handgun in the weeks prior to the crimes, asserting that the probative value of such proof was outweighed by its prejudicial effect. Again, we do not agree.

Generally speaking, evidence of uncharged crimes or prior bad acts may be admitted where they fall within the recognized Molineux exceptions—motive, intent, absence of mistake, common plan or scheme and identity (see People v Molineux, 168 NY 264, 293 [1901])—or where such proof is "inextricably interwoven with the charged crimes, provide[s] necessary background or complete[s] a witness's narrative" (People v Tarver, 2 AD3d 968, 969 [2003]; see People v Poquee, 9 AD3d 781, 782 [2004], lv denied 3 NY3d 741 [2004]). Here, evidence regarding defendant's prior drug dealing activities not only provided necessary background information and explained the

the murder and asked if he knew of anyone who would be interested in purchasing a .40 caliber handgun.

**2.** For example Parker, who is approximately four feet, nine inches tall, underestimated the height of her assailant.

relationship between defendant and the victim, but also, when viewed in the context of defendant's financial difficulties, established defendant's motive for killing the victim (*see People v Lee*, 80 AD3d 877, 880 [2011], *lv denied* 16 NY3d 832 [2011]; *People v Smith*, 63 AD3d 1301, 1303 [2009], *lv denied* 13 NY3d 862 [2009]; *People v Camarena*, 289 AD2d 7, 7 [2001], *lv denied* 97 NY2d 752 [2002]). We reach a similar conclusion regarding defendant's prior possession of a .40 caliber handgun, as such proof demonstrated defendant's familiarity with and access to weapons (*see People v Camarena*, 289 AD2d at 8)—even if the weapon described was not directly linked to the crimes for which defendant was on trial (*compare People v Lee*, 80 AD3d at 880; *People v Williams*, 28 AD3d 1005, 1008 [2006], *lv denied* 7 NY3d 819 [2006]). As the probative value of such proof outweighed its prejudicial effect, we discern no error in its admission. Finally, defendant's claim that County Court erred in failing to give contemporaneous limiting instructions regarding such proof is unpreserved for our review and, were we to reach this issue, we would find any error in this regard to be harmless given the overwhelming evidence of defendant's guilt (*see People v Tyrell*, 82 AD3d 1352, 1356 [2011], *lv denied* 17 NY3d 810 [2011]; *People v De Fayette*, 16 AD3d 708, 709-710 [2005], *lv denied* 4 NY3d 885 [2005]; *compare People v Westerling*, 48 AD3d 965, 968 [2008]).

We reach a similar conclusion regarding defendant's assertion that County Court erred in admitting certain fingerprint evidence without conducting a "complete and thorough" *Frye* hearing. The primary flaw in defendant's argument on this point is that the allegedly novel scientific technique at issue—a software program known as MoreHits—did not actually "match" the prints lifted from the crime scene with the known prints belonging to defendant and/or the victim. As the State Police investigator who conducted the fingerprint analysis explained, the MoreHits program allows an examiner to digitally scan a fingerprint lift, enlarge it, adjust the contrast and isolate particular portions of the lifted print. Although such capabilities enable the examiner to focus in on areas where possible points of comparison may exist, the software program itself does not make the "match." Rather, as the investigator repeatedly and unequivocally testified at trial, he made the final matches by comparing defendant's exemplar to the fingerprints found on the coffee table in the victim's living room and by comparing the victim's postmortem fingerprints to the print found on the inside of the small plastic bag subsequently discovered in the backpack. Specifically, the investigator testified that he physically made these side-by-side comparisons utilizing a standard

four-power magnifier and a set of small pins to mark the individual points of identification. Thus, as it was the investigator—using familiar and established techniques—who made the actual matches here, we discern no need for a *Frye* hearing.

As for defendant's assertion that he was deprived of a fair trial due to comments made by the prosecutor during summation, the challenges now raised by defendant were not preserved by appropriate objection (*see People v Robertson*, 53 AD3d 791, 793 [2008], *lv denied* 11 NY3d 857 [2008]; *People v Booker*, 53 AD3d 697, 704 [2008], *lv denied* 11 NY3d 853 [2008]), and we decline to exercise our interest of justice jurisdiction with respect thereto (*see* CPL 470.15 [6] [a]). Finally, we reject defendant's claim that the sentence imposed was harsh and excessive. Although defendant was only 19 years old at the time of his arrest, he already had amassed a substantial criminal record and, as noted previously, was on parole when he committed the underlying crimes. The record reflects that defendant, who expressed little remorse at sentencing, fired two gunshots at the victim—penetrating the victim's heart, liver and brain, tearing through the victim's vena cava and lacerating the blood vessels at the base of the victim's brain—and thereafter held a gun to Parker's head, threatening her life if she failed to comply with his demands. Under these circumstances, we cannot say that County Court abused its discretion in imposing sentence, nor do we find any extraordinary circumstances to warrant modification of the sentence in the interest of justice (*see People v Hansen*, 290 AD2d 47, 57 [2002], *affd* 99 NY2d 339 [2003]; *People v Johnson*, 277 AD2d 702, 707-708 [2000], *lv denied* 96 NY2d 831 [2001]). Defendant's remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Peters, J.P., Spain, Lahtinen and Stein, JJ., concur. Ordered that the judgment is affirmed.